CLARK ET AL. v. HYMAN ET AL.

1. **Guaranty**: PARTNERSHIP: RATIFICATION. A guaranty executed in the name of a partnership by one of its members, although without the scope of the partnership business, may become binding upon the firm by being ratified or acquiesced in by the other members. A written instrument construed and held to constitute a continuing guaranty for indebtedness created on account.

2. **Mortgage**: ON CHATTELS: POWER OF SALE RESERVED BY MORT-GAGOR. The rule announced in *Hughes v. Cory*, 20 Iowa, 398, that in a mortgage upon a stock of merchandise the reservation by the mortgagor of the power to sell in the ordinary course of trade does not invalidate the mortgage, followed and applied.

3. ——: ——: ——: ACCOUNTING FOR PROCEEDS. The fact that the mortgagor is not required by the terms of such mortgage to account to the mortgagee for the proceeds of sales will not render the mortgage invalid.

4. ——: ——: STATEMENT OF DEBT. A mortgage which stated the indebtedness secured thereby as a certain gross amount was held sufficiently specific, where such indebtedness was in fact upon several promissory notes, which, with accrued interest, aggregated the amount stated.

## Appeal from Polk Circuit Court.

### TUESDAY, DECEMBER 7.

ON the 14th day of November, 1878, the defendant Ike Hyman executed to his brother, Joseph Hyman, a chattel mortgage upon all his stock of hats, caps, furs, gloves, robes, umbrellas, jewelry and gent's furnishing goods and fixtures, in his two storerooms situated at numbers 402 and 411, Walnut street, Des Moines.

On the 29th day of November, 1878, the defendant Ike Hyman executed to Goldman & Hyman a chattel mortgage upon the same property. On the 29th day of November, 1878, but after the execution of the mortgage last aforesaid, Eddy, Harvey & Co. and Sweet, Dempster & Co. brought their respective suits in the United States Circuit Court, against the said Ike Hyman, for merchandise sold him in September, 1878, and caused writs of attachment to be levied upon said stocks of goods.

On the same day the officer serving said writs of attachment, upon demand of Joseph Hyman, surrendered the goods to him as mortgagee, and garnished Joseph Hyman and Goldman & Hyman. After the notices of garnishment were served, but on the same day, the plaintiffs sued out their writ of attachment in the Polk Circuit Court, against the property of Ike Hyman, which was served by garnishing Joseph Hyman and Goldman & Hyman.

Whilst these proceedings were pending, on the 9th day of December, 1878, the plaintiffs commenced this action to declare the mortgages fraudulent, and for the appointment of a receiver of the mortgaged property. On the 11th day of December, 1878, a receiver was appointed. On the same

day George W. Gifford & Co. filed a petition of intervention, claiming of the defendant Ike Hyman $381, asking an attachment and praying, that they may be declared to have a lien upon any funds in the hands of the receiver, which may remain after the payment of the existing liens. On the 18th of December, 1878, the receiver sold the stock of goods to Goldman & Hyman for $5,850.00, and took from them a bond for payment. On the 14th day of May, 1879, Eddy, Harvey & Co. recovered judgment against Ike Hyman for $691.00, and on the same day Sweet, Dempster & Co. recovered judgment for $640.20. On the 28th day of August, 1879, the plaintiffs recovered judgment against Ike Hyman, in their attachment proceeding, for $1,411.92. On the 4th day of October, 1879, Eddy, Harvey & Co. and Sweet, Dempster & Co. filed petitions of intervention in this action.

The court found that when the receiver took possession of the said stock there was rent due from Ike Hyman to the amount of $225 which was a first lien on said fund, that the mortgage to Joseph Hyman is a valid security to the amount of $3,547.67, and is a second lien upon the fund; that the mortgage to Goldman & Hyman is a valid security to the extent of $1,000, and is a third lien upon the fund; that Goldman & Hyman are entitled to $75 as attorney's fees, and $69 expended in taking possession of the property and advertising for sale; that after the payment of the above amounts the intervenors and plaintiffs have liens upon said fund in the following amounts and order:

| | |
|---|---|
| Eddy, Harvey & Co. | $641.00 |
| Sweet, Dempster & Co. | 640.20 |
| Clark Brothers | 1,411.92 |
| George Gifford & Co. | 381.00 |

It was thereupon ordered that Goldman & Hyman pay to the receiver $532.98, the balance due upon their purchase of the property, and that the remainder in the hands of the re-

ceiver, after paying the expenses of the suit, be paid to the intervenors Eddy, Harvey & Co. The intervenors appeal.

*A. B. & J. C. Cummins*, for appellants.

*Wright, Gatch & Wright* and *Macy & Sweeney*, for defendants.

DAY, J.—I. As to the mortgage to Goldman & Hyman. This mortgage is dated November 29, 1878, and is for the expressed consideration of one thousand dollars, and is conditioned as follows: "That if the said Ike Hyman shall save the said Goldman & Hyman harmless as guarantors for him, and save them from loss by reason of their said guarantee heretofore made on his account, then these presents to be void, otherwise in full force."

The guaranty referred to in this mortgage is as follows: "For and in consideration of the sum of one dollar to us in hand paid by Messrs. F. Forsch & Co., the receipt of which is hereby acknowledged, we do hereby guarantee the prompt payment at maturity by Isaac Hyman, of Des Moines, Iowa, for all bills of merchandise which the said F. Forsch & Co. may sell to the said Isaac Hyman, at any time after the date hereof (not exceeding however, the amount of one thousand dollars). This guarantee to continue in full force for the sum of one thousand dollars until countermanded in writing, and we undertake and agree that, in the event of the said Isaac Hyman not paying any of the bills covered hereby at maturity, to pay same on demand, and without requiring said F. Forsch & Co. to sue said Isaac Hyman for the same. In witness whereof we have hereunto set our hand and seal, this 15th day of March, 1877.

"GOLDMAN & HYMAN."

Mr. Goldman, a member of the firm of Goldman & Hyman, testified that he executed the guaranty while in the East and explained to his partner after he got back, and that since the

commencement of this suit he executed a note in settlement of the guaranty, payable in four months, without interest. The evidence shows that after the guaranty, and before the purchase of the goods for which Ike Hyman now owes F. Forsch & Co., he had purchased from them more than one thousand dollars worth of goods, for which he had paid, and that when this mortgage was executed he owed them eleven or twelve hundred dollars. The appellants claim that this mortgage is of no effect as against intervenors, for the reason that it was executed as indemnity for any liability that might exist by reason of the guaranty, and there was in fact no liability on the part of Goldman & Hyman upon said guaranty, because: *First*. It was not executed by any one authorized to bind the firm of Goldman & Hyman upon such an obligation. *Second*. It is not a continuing guaranty, and was exhausted before the mortgage was given.

1. It may be conceded that Goldman, merely as a member of the firm, had no authority to bind it by the guaranty 1. GUARANTY: partnership: ratification. in question. Still, it cannot be doubted that the firm might ratify and adopt his unauthorized act. It appears from the evidence that Goldman, upon his return from the East, informed his partner, Joseph Hyman, what he had done. Joseph Hyman is the brother of the defendant Ike Hyman, and had before that furnished him money to go into business, and at various times advanced him considerable sums. It does not appear that he expressed any dissatisfaction with his partner's act. Upon the contrary, as a member of the firm he accepted a mortgage to secure the firm for any liabilities incurred by the guaranty. From this act a ratification of the contract of guaranty may well be inferred.

2. The guaranty is a continuing one. It provides: "This guaranty to continue in full force, for the sum of one thousand dollars, until countermanded in writing."

Appellants insist that Forsch & Co. simply intended to guard against a verbal revocation, and that this language sim-

ply determines the manner in which the guaranty may be revoked, and has no reference to its duration.

It is claimed that when Forsch & Co. extended credit to Ike Hyman to the extent of $1,000, and he paid that sum, the guaranty at once became exhausted. But this construction does not give proper force to the language that the guaranty shall continue until countermanded in writing.

II. As to the mortgage to Joseph Hyman. This mortgage is for the expressed consideration of $3,500, is dated November 14, 1878, and contains the following provisions: " Upon condition, however, that if the said Ike Hyman shall pay to the said Joseph Hyman, his heirs, assigns, etc., the sum of thirty-five hundred dollars, for and on account of advances made and money loaned by the party of the second part to him, the said Ike Hyman, together with interest at the rate of ten per cent per annum from the date of each several sum at divers times heretofore advanced by the said party on or before January 1, 1879. Upon condition, also, that the said party of the first part shall also pay unto the said party of the second part any additional sums that he may advance, together with a like rate of interest as last above stated. Then, on the payment as aforesaid, these presents to be void, otherwise in full force. And I, the said Ike Hyman, do hereby covenant and agree to and with the said Joseph Hyman, in case of default of payment of the above mentioned sums of money loaned and advanced, or the further sum or sums that may be advanced, or in case of my attempting to dispose of said stock of goods or fixtures other than in the usual course of retail trade, or in my attempting to remove from the said county of Polk the aforesaid goods and chattels, or whenever the said mortgagee shall choose so to do, then, in that case, it shall be lawful for the said mortgagee or his assigns, by himself or his agent, to take possession of said goods wherever found, the possession of these presents being his sufficient authority therefor, and to sell the same at public auction, or so much thereof as shall be

necessary to pay the amount due or to become due, as the case may be, together with all costs pertaining to the taking, keeping, advertising and selling of said property, together with a reasonable attorney's fee if the same be foreclosed, or placed in an attorney's hands for foreclosure and collection. The money remaining after paying said sums, if any, to be paid on demand to said party of the first part."

1. It is claimed by the appellants that this mortgage is fraudulent in law, or *per se*, because it is a conveyance ·by

2. MORTGAGE: on chattels : power of sale reserved by mortgagor. mortgage of a stock of merchandise, accompanied with an arrangement for sales in the usual course of trade. Appellants concede that in *Hughes v. Cory*, 20 Iowa, 399, this question was directly considered by this court, and decided adversely to their position. It is claimed, however, that *Hughes v. Cory* is not only opposed to the weight of authority, but wrong in principle, and we are asked to overrule it. That case was determined in 1866. It received the most careful and deliberate consideration. It discusses the rule at common law, and in many of the States of our Union, and shows its inapplicability to the peculiar provisions of our statute. For fourteen years this decision has been regarded as an authoritative settlement of the questions involved in it. We ought not now to be expected to enter upon a re-examination and reconsideration of these questions.

"The rule *stare decisis* is one of the most sacred in the law." It is even of more "importance that a rule should be fixed and stable than that it should be strictly just." If we should disregard the maxim of *stare decisis*, "like the ever returning but never ending labors of the fabled Sisyphus, we would, in each recurring case, have to enter upon its examination and decision as if all were new, without any aid from the experience of the past, or the benefit of any established principle or settled law. Each case, with its decision thus limited, *as law*, to itself alone, would in turn pass away and be forgotten, leaving behind it no record of principle estab-

lished, or light to guide, or rule to govern the future." Ram's Legal Judgments, p. 199, 234 and 415.

If it be true that the rapidly increasing commercial interests of the State require that a merchant desiring to secure his creditor upon his stock of goods shall surrender the goods and quit business, rather than that he shall be allowed to continue business in the usual way, the most cogent and controlling reasons require that such a rule of law shall be declared by the legislature, and not by this court.

2.   It is further claimed that the mortgage is not a valid lien, because there was no agreement respecting the disposi-

3. ──── : ────  :
──── : accounting for proceeds.

tion of the proceeds of the sales; no agreement to account, and, in fact, no accounting.   Counsel concede that the reasoning of the court in *Hughes v. Cory* covers this point.   But as there was in that case an agreement to account to the mortgagee for thirty-three per cent of the sales, we are asked not to extend the doctrine of that case to one where there is no agreement to account for the proceeds of the sales.

From an examination of the case of *Hughes v. Cory* it will appear that the fact that the mortgagor had agreed to account to Cory, the mortgagee, for thirty-three per cent of the proceeds of the sales was not regarded as a circumstance favorable to the validity of the transaction.   Upon the contrary, the court proceeded to show that the transaction was valid, not *because of*, but *notwithstanding*, the provision.   On page 408 the court say:  " Nor do we see that the mortgage, in the sense prohibited by the law, reserves an interest in or secures a benefit to the mortgagor at the expense of his other creditors.   If he had agreed to apply all the proceeds to the payment of Cory's debt, or if Cory had taken an instrument letting him into the immediate possession, with a right to receive all the proceeds, the other creditors would have been in a worse condition than they were by the instrument as it was, and yet this would, under the decisions of this court,

have been valid." *Torbert v. Hayden*, 11 Iowa, 435; *Adler & Brother v. Claflin*, 17 Id., 89.

If an agreement to apply thirty-three per cent of the proceeds of the sales to the satisfaction of the mortgage is more favorable to the other creditors than an agreement to so apply all the proceeds, it follows that the most favorable arrangement for the other creditors is when there is no agreement to so apply any of the proceeds of sales.

The decision in *Hughes v. Cory* is not only applicable, but it is applicable *a fortiori* to this case.

3. It is urged that the mortgage in question was in fact executed with the intent to hinder, delay and defraud the creditors of the mortgagor.

The evidence shows that Joseph Hyman furnished his brother Ike the principal part of the capital with which he commenced business in 1876. From time to time Joseph advanced to Ike various sums, taking his notes therefor, so that there was, at the time the mortgage in question was executed, an actual, *bona fide* indebtedness existing, exclusive of interest, amounting to $3,162.40, and, including interest, amounting to about $3,500.

Joseph insisted upon being secured. We cannot find from the evidence that he intended to hinder, delay or defraud other creditors, or that he had any other purpose than to obtain actual security for himself. He was much the largest creditor, and it cannot be regarded as a fraudulent circumstance that he desired security, notwithstanding the fact that he knew that Ike owed other debts. The fact of his relationship ought not to deprive him of the rewards of superior diligence so long as he sought only to protect himself and not to injure others. It is true the securing of his debt left the debtor without the means of paying his other creditors. But this always results when an insolvent debtor secures a part of his creditors. Yet it has never been held that this fact alone renders the transaction fraudulent if otherwise *bona fide*. The goods were left in the possession of the mortgagor, and

he was allowed to continue in business.   But this placed the other creditors in no worse condition than if the stock had been taken and the business closed.   It is said that Ike represented that he was not indebted to his brother.   But the person to whom the representation was made did not extend credit upon the fact of it, and it is difficult to see how Joseph could be affected by such a representation.

Upon a careful examination of the whole testimony we are unable to find that Joseph Hyman took this mortgage for the purpose of delaying, hindering or defrauding the other creditors of Ike.   The evidence, we think, shows that he took it for his own protection and security, and not for the injury of others.

4.   It is insisted that the mortgage is void for the reason that the indebtedness is not sufficiently described in the instrument.   Ike Hyman was indebted upon several promissory notes for money loaned and advanced from September 28, 1876, to July. 12, 1878, in the sum of $3,162.40, exclusive of interest, and including interest in the sum of $3,518.80.

*4. ——:——. statement of debt.*

The debt secured is described as follows:   "Upon condition, however, that if the said Ike Hyman shall pay to the said Joseph Hyman, his heirs, assigns, etc., the said sum of $3,500, for and on account of advances made and money loaned by the party of the second part to him, the said Ike Hyman, together with interest at the rate of ten per cent per annum from the date of each several sum at divers times heretofore advanced by the said party, on or before January 1, 1879,   *   *   *   *   then these presents to be void."

Appellants cite and rely upon *Pettibone v. Griswold*, 4 Conn., 158; *North v. Belden*, 13 Id., 376; *Hart v. Chalker*, 14 Id., 77; *Sanford v. Wheeler*, 13 Id., 165; *Jewett v. Preston*, 27 Me., 400; *Fallett v. Heath*, 15 Wis., 601, and *Bramhall v. Flood*, 41 Conn., 68.   In *Pettibone v. Griswold*, the condition of the mortgage was to pay a note accurately described, and "all other notes the said grantee might

indorse for or give for said Griswold at the bank or elsewhere, and all receipts said Pettibone, deceased, might hold against said Griswold." No allegation of non-payment was made as to the note, and it was presumed that it had been paid. The whole controversy arose over the other debts referred to in the mortgage.

As to these the description was entirely indefinite, embracing all notes the grantee might in the future indorse or give for Griswold. As to these the mortgage was held inoperative. The difference between that case and the one at the bar is apparent at a glance.

In *North v. Belden*, the condition of the mortgage was simply for the payment of a note for $500, dated the 8th of March, 1836, and payable on demand. The note in fact secured by the mortgage was made and delivered to the plaintiff to secure him for indorsing or otherwise becoming responsible for Belden for a sum not exceeding $500, in pursuance of an agreement between them that the plaintiff would assume such responsibility from time to time as should be requested by Belden. It was held that the mortgage was not valid as against the creditors of the mortgagor, because the real nature of the transaction did not appear upon the face of the record with reasonable certainty.

In *Sanford v. Wheeler*, Stephen Wheeler, who was insolvent, owed his son George Wheeler a *bona fide* debt of $1,418.36. He was also indebted to several other creditors in various sums, amounting in all to $1,182.80, for which George Wheeler had become liable as surety for him. George had not paid these debts, and Stephen had not been discharged from them, but his estate was still responsible for them and they had been presented to the commissioners upon his estate and allowed. Stephen executed to George a mortgage to secure an unconditional note for $2,601.16, payable on demand. This note was made up of the *bona fide* debt due from the mortgagor to the mortgagee, and the amount for which the latter had become surety. There was no actual fraud in the transaction. It

was held that, as to the amount for which George was surety merely, the mortgage was invalid as to the other creditors, because a claim altogether different in its nature, character and amount from the one referred to in the condition of the mortgage was attempted to be substituted for the debt described—the claim of a surety and not of a creditor.

In *Hart v. Chalker*, the condition of the deed described the subject of the mortgage as a debt due from the mortgagor to the mortgagee by note dated 10th of May, 1834, payable on demand, but did not state the amount of the note. It was held not valid as against subsequent incumbrances.

In *Bramhall v. Flood*, the mortgage described the debt secured as a note of $1,000. No such note had ever been given, but the mortgagor was indebted for goods sold to the amount of $471.26, and the latter had agreed to furnish additional goods to the extent of $1,000, and the mortgagor made the mortgage as security for the whole. The mortgage was held void against a subsequent attaching creditor.

In *Jewett v. Preston*, the mortgage which was held invalid purported to have been made to secure two notes, one for $700, dated July 13, 1828, and one for $500, dated January 31, 1835. The evidence showed that the mortgagee never had such notes, but that he held three notes of the mortgagor, one for $800, one for $1,000, on which $500 had been paid, and one of $700, none of them bearing date as stated in the mortgage.

In *Fallett v. Heath*, it was held that where a chattel mortgage, through mistake, gives a totally false description of the note it was intended to secure, a seizure of the property by the mortgagee cannot be justified in an action at law without reforming the instrument. It is evident that these cases all embrace a principle different from that involved in the case at bar, though it must be conceded that in the earlier cases in the State of Connecticut principles were recognized in announcing the conclusions which would extend the doctrines of the decisions to other cases of quite different character.

But the doctrines announced in these earlier cases seem not to be altogether satisfactory even to that court, for in *Lewis v. De Forest*, 20 Conn., 427, where the condition of the mortgage specified that the mortgagee was an accommodation indorser and signer for the mortgagors on sundry notes, drafts, and bills of exchange to the amount of $50,000, which were then maturing, a particular description of which they were not able to give, and the mortgagors were in a failing condition, and it was necessary to give the security before a more accurate description could be made, it was held the description was sufficient.

In Jones on Mortgages, section 70, it said that the late case of *Bramhall v. Flood*, 41 Conn., 68, " is an extreme case and not to be relied upon."

In *Hurd v. Robinson*, 11 Ohio St., 232, (238), referring to the course of decision upon this subject in the State of Connecticut, the following language is employed:  " The question in a dozen or more cases has come before the Supreme Court of that State and has evidently produced a degree of painful uncertainty in mortgage securities.

" This is shown by the case of *Merrills v. Swift*, 18 Conn., 257, in which the court was equally divided upon the question whether a mortgage to secure several notes, and a book debt to the amount of fifteen hundred dollars or thereabouts, was valid.   This uncertainty must ever exist when the construction and effect of a written instrument, as conferring a right or title, are made to depend, not upon simple and elementary rules of law, easily capable of application, but upon a question of degree to be decided upon the character and nature of each particular transaction.   It is not surprising, therefore, that the course of decisions should fluctuate, and that in the last decision in Connecticut we should  meet with the remark with reference to certain deeds under examination, ' although our earlier decisions would hold them void for vagueness, our decisions for the last ten or fifteen years have gone further and established the law to be liberal enough to

sustain mortgages quite as indefinite and vague as the present.'
*Utley v. Smith*, 24 Conn., 270, 314.   Did we feel at liberty
to extend our statute upon a notion of public policy, we
should hesitate long before we adopted a principle from
another state, the working of, which appears to have been so
harsh and unsatisfactory as to have led to its relaxation if not
to its practical abandonment."

In *Hurd v. Robinson*, 11 Ohio St., 232, a mortgage was
held valid as to third persons in which the condition was as
follows: "*Provided always*, and these presents are upon
these conditions, that whereas the said Robinson is indebted
to said bank for moneys loaned and for his liability on divers
bills of exchange and promissory notes; now, if said Robinson
shall discharge his said several liabilities in six months from
this date, then these presents shall become void, otherwise to
remain in full force and virtue."

In *Michigan Insurance Company v. Brown*, 11 Michigan,
266, a mortgage conditioned for the payment of all sums now
due or hereafter to become due, but without specifying any
amount, was held valid.   The same doctrine was announced
in *Machette v. Wanless*, 1 Col., 225.   See, also, *Gill v. Pin-
ny's Adm's*, 12 Ohio St., 38 (48); *Webb v. Stone*, 24 N. H.,
282.

The description in the mortgage in the case at bar is not
as indefinite as in some of the cases above referred to.   It
states the amount of the indebtedness secured within a few
dollars of its actual amount, and underestimates instead of
overstating it.   We feel no hesitancy in holding that the
statement of the debt secured is sufficient.

AFFIRMED.